SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

-------------------------------------------------------------------X

**MANUEL ROEL, Individually and Derivatively
as 50% Shareholder of ROEL & HSU CORP., as
as 25% Shareholder of CHRL REALTY CORP.,
as 25%Shareholder of RLCH, INC., and as 25%
Shareholder of 190-15 48th AVENUE CORP.,**

Index No. 709652/17
(J. Livote)

**Plaintiff,**

**- against -**

**JOE HSU, ESTHER HSU, ROEL & HSU CORP.,
RLCH, INC., CHRL REALTY CORP.,
190-15 48TH AVENUE CORP., MOU YANG LAM,
KWAN CHO CHEUNG, MING KAM CHEUNG,
HEONG LENG LOU, JIM GUO LIN, KAM MING
LAM, and SIU LING WONG,**

**FIRST AMENDED
VERIFIED COMPLAINT**

**Defendants.**

-------------------------------------------------------------------X

**STEVEN CHEUNG, MING YUNG CHEUNG, GUI
ZHEN CHEN, CHEUNG, CHIN CHAU, TUNG SUET
RUBY LAM and WONG KUK TAN,**

**Defendants/Intervenors.**

-------------------------------------------------------------------X

Plaintiff **MANUEL ROEL** (**"Plaintiff" or "Manny"**) by and through his attorney,

**ROBERT D. WERTH, ESQ.**, as and for his First Amended Verified Complaint against

defendants **JOE HSU, ESTHER HSU, ROEL & HSU CORP., RLCH, INC., CHRL REALTY**

**CORP., 190-15 48TH AVENUE CORP., MOU YANG LAM, KWAN CHO CHEUNG, MING**

**KAM CHEUNG, HEONG LENG LOU, JIM GUO LIN, KAM MING LAM and SIU LING**

**WONG (**sometimes collectively referred to as "Defendants") and against **STEVEN CHEUNG,**

**MING YUNG CHEUNG, GUI ZHEN CHEN, CHEUNG, CHIN CHAU, TUNG SUET**

**RUBY LAM and WONG KUK TAN ("Defendants/Intervenors")**[1] alleges as follows:

---

[1] This First Amended Verified Complaint contains no specific averments against any of the Defendants/Intervenors as they have been decreed party defendants by the Court under Court Orders dated December 3, 2018 in response to two motions to intervene (Mot Seq 10 and 12) filed by counsel for those individuals heretofore.

Case 1:20-01102-fcg   Doc 1-1   Filed 08/28/20   Entered 08/28/20 17:03:31

## NATURE OF THE ACTION

1.    Plaintiff Manuel Roel seeks various forms of pecuniary and equitable relief in this complex commercial litigation, on both an individual and derivative basis, against defendant Joe Hsu ("Mr. Hsu" or "Joe"), his wife/defendant Esther Hsu ("Mrs. Hsu" or "Esther"), the four corporate defendants formed by Mr. and Mrs. Hsu for the purpose of acquiring, operating, rehabilitating and selling real estate as part of their joint venture/partnership (but which were not used for such purposes for the most part), and against the remaining defendants who were involved in some of the underlying real estate transactions for various purposes and in various capacities, most of which was kept secret by Mr. and Mrs. Hsu, unbeknownst to the Plaintiff over the years.

2.    While the initial agreement and understanding between co-founders Plaintiff and Mr. Hsu was straight forward, namely, to form companies to be used as vehicles for the purchase, operation, rehabilitation and eventual sale of various pieces of real estate, what actually occurred is anything but, and as it turned out, ground in fraud on the part of Mr. and Mrs. Hsu, along with the other primary individual defendants, defendant Mou Yang Lam ("Lam") and defendant Kwan Cho Cheung ("Cheung"), who used the business to further their own financial ends, at the expense of the Plaintiff who seeks money damages on a variety of legal grounds in excess of $3 Million plus various declaratory findings for Plaintiff, including for a determination that Plaintiff is the free and clear owner of 25% of what is called the Barclay Project, the last active project which remains ongoing among the partners, which has an estimated fair market value in excess of $16 Million and is unencumbered.

3.    It is worth noting that Mr. Hsu is an experienced licensed real estate broker, real estate developer and investor of over fifty (50) years, while the Plaintiff was a hard-working artisan-contractor throughout his life (only retiring after completing the subject Projects at issue in this case), who created and added value to all of the properties that became part of the joint venture,

while Mr. Hsu and his wife, Mrs. Hsu – who acted as the chief financial officer and bookkeeper for all of the subject businesses and properties – did the easy part, the paperwork, while failing to provide Plaintiff with any proof of the spending on each of the projects over time, failing to provide Plaintiff with regular (or even annual statements) detailing the profits which Mr. and Mrs. Hsu claimed to be holding as a fiduciary for the Plaintiff, and failing to provide tax returns, bank statements, the general ledger and all of the ordinary financial and business records which honest individuals share with their business partners and associates. Generally speaking, the Hsu Defendants failed to keep Plaintiff (and many of the other individual defendants) apprised of the value of his work from year to year, and how much they were holding for him over time.

4.        The agreement for the joint venture/partnership between Mr. Hsu and Plaintiff was simple. It was for them both to jointly form shell companies for the purpose of buying, organizing, operating, managing, rehabbing, and selling residential real estate, using Plaintiff's skills, time and labor as a contractor to perform the work himself as a general contractor, and for some aspects of the projects, to hire and supervise subcontractors. The underlying real estate projects ranged from undertaking a variety of construction work (demolition, carpentry, dry walling, plumbing, roofing, etc.) to complete gut rehabilitation projects, while Mr. Hsu, the sophisticated real estate business professional, both as a licensed real estate broker, and as an investor and developer and Mrs. Hsu, formed the entities to buy and sell realty, and in doing so, Mr. and Mrs. Hsu were to transfer the profits made into a general coffer, which would accumulate and increase with each subsequent transaction. The general partnership/joint venture was understood to be for the continuing purchase, improvement and sale of real estate, each time using the profits from the prior project to buy ever larger pieces of real estate for the next project, and to make greater and greater profits over time, which Mr. and Mrs. Hsu represented they would hold and apply as a fiduciary for both Mr. Hsu and the Plaintiff.

3

Case 1:20-01102-fcg   Doc 21   Filed 08/28/20   Entered 08/28/20 17:03:31

5.      In retaining counsel in 2017, however, Plaintiff discovered that Joe kept the properties in his own name, failed to transfer them to their joint corporation (R&H Corp), and failed to keep Plaintiff apprised of any of the finances or discuss with him matters which required joint decisions; after all, Plaintiff was at this point a 50-50 partner with all concomitant rights as such.  While Mrs. Hsu was not a necessarily a formal partner, she was clearly Mr. Hsu's partner and directly involved and profited from the joint ventures between Mr. Hsu and Plaintiff, as Mr. and Mrs. Hsu shuffled money throughout the various corporate accounts and even their personal bank accounts, as they saw fit.  In fact, it is Plaintiff's understanding through his dealings with Mr. and Mrs. Hsu that she was not merely a silent partner but fully involved in all decision making for the couple.  They jointly had completed 100% dominium and control of all of the finances of all business between Mr. Hsu and Plaintiff and all related financial records.  Mr. and Mrs. Hsu so dominated the various formed corporations (and individual transactions) and failed to undertake the most basic forms of corporate governance – holding meetings, consulting the Plaintiff partner on major decisions, holding votes and having minutes of those meetings – that we will be seeking to pierce the corporate veil of all of the subject defendant corporations and have the individual defendants liable for all damages in this case, and intend to hold the only remaining corporation, RLCH, Inc. liable under the doctrine of successor liability and alter ego entity liability, as that entity holds realty which is in essence the accumulation of all Plaintiff's profits from all of the underlying transactions over the years, which Mr. Hsu, Lam, Chong and the other defendants were never authorized to join the original joint venture by Plaintiff, but join they did under the purported authority of Mr. Hsu alone.  In other words, RLCH now holds the cash made by Plaintiff from all of the other real estate ventures which were part and parcel of the Hsu/Plaintiff joint venture, and so is now obligated to Plaintiff for the return of his properly earned funds.

4

6.      A key understanding and agreement between Mr. Hsu and Plaintiff right from the start was the agreement that since Mr. Hsu (with his wife Mrs. Hsu) would be responsible for maintaining the books and records for the underlying transactions, for the various entities and for all of the business entanglements of the parties, that he would regularly – monthly is what Joe had agreed to – inform Plaintiff in writing of the value of his interest in their joint venture, and would otherwise allow him full access to all books and records.  They failed to do so however.

7.      Moreover, there was to be no formal consideration paid to Mr. and Mrs. Hsu for this work as it was nominal part of the exchange of consideration between the parties, as Mrs. Hsu was already operating Mr. Hsu's real estate office, Big Apple Realty, and the time spent weekly was nominal on each of the underlying projects.  Yet it was discovered that Mrs. Hsu was given a huge income relative to the work performed for each of the dozen or so underlying projects, roughly $6000 plus per project, which is just outrageous theft.  But as they controlled all of the monies, they did as they pleased, even if it was self-dealing and breaching the fiduciary duties owed to the Plaintiff, and was certainly done without Plaintiff's knowledge or consent.

8.      Mr. Hsu and Mrs. Hsu found someone who was a hard worker and an honest man, now 83 years of age (roughly the age of Mr. and Mrs. Hsu), and who simply accepted over years the diversionary tactics of Mr. and Mrs. Hsu, along with Mr. Lam and Mr. Cheung, who failed and refused to provide genuine backup of all of the paperwork for all of their transactions which they had been working on since 2005.

9.      Most recently, through acquisitions in 2008 and 2012, by RLCH (aka Roel, Cheung, Hsu and Lam), it was the intention of the parties to develop a 7-story residential property from two separate properties, and sell the building for a profit.  But still, neither Mr. or Mrs. Hsu, or Cheung or Lam were willing to provide Plaintiff with details of the prior transactions and the

5

financial outcomes of same, despite being involved from the onset in 2005, with the exception of Lam and Cheung who came in a year or so later.

10. Bottom line, Plaintiff did all of the construction, labor and purchase of materials for approximately 10 projects, with one project remaining, the Barclays Project, still owned by RLCH, of which Plaintiff is at least a 25% owner. Plaintiff's percentage interest in that project was clear from the very start, including through the predecessor entity, CHRL, wherein Plaintiff owned 25% of the whole as well.

11. Recently, in the spring of 2017, counsel for Mr. Hsu provided counsel for the Plaintiff a document dated December 23, 2008, which Plaintiff's counsel then provided to the Plaintiff, wherein the defendants, in particular, Ms. Hsu, Mr. Lam and Mr. Cheung attempted to dilute Plaintiffs interest in RLCH from 25% to 16%. Upon showing this document to Plaintiff, he was shocked as he never signed that document, nor had he ever seen that document before. In other words, among the many claims in this case is that this purported document contains the forged signature of Plaintiff Manuel Roel, and our expert will attest to same at trial. Moreover, even if the document were a valid and enforceable document, this bogus document only includes one of the two Barclay Avenue properties, namely, 144-73 Barclay, and fails to include the other property known as 144-69 Barclay Avenue, which jointly comprise the Barclay Project. So even in their fraudulent efforts to dilute the Plaintiff's interests in RLCH, they failed to do so such that it would have any legal validity or enforceability as to the Plaintiff and the entire Barclay Project, as their remains no written agreement, forged or otherwise, for 144-69 Barclay Avenue.

12. Finally, to be clear, not only did Mr. and Mrs. Hsu (as bookkeeper and aider and abettor of fiduciary, Mr. Hsu) fail to correctly credit Plaintiff's account which they were supposed to be holding and protecting as they purchased larger and larger properties for a profit, it seems that only Mr. Hsu and Mrs. Hsu –along with Mr. Lam and Mr. Cheung upon information and belief

– made money from all of the underlying real estate transactions, with the exception of a relatively small sum which they attributed to the Plaintiff and credited him as part of his interest in the Barclay Project. Moreover, Plaintiff was never properly credited for all of the costs, materials and his labor for all of the work performed for the roughly 10 underlying real estate projects, which reimbursement was supposed to be paid to the Plaintiff from the gross profits, before either party (or any party) was entitled to split net profits. This itself constituted unjust enrichment in favor of Mr. Hsu, Mr. Lam and Mr. Cheung in the millions of dollars.

13.  Also worth noting is that Plaintiff only spoke Spanish while Mr. Lam and Mr. Cheung spoke only Chinese/Mandarin. Mr. and Mrs. Hsu both spoke Spanish and Chinese so would often be the translator, but there were many attempts at communication between Plaintiff and Mr. Lam and Mr. Cheung which clearly did not constitute meetings of the minds as they did not understand one another to sufficiently clarify their agreements, terms, conditions and understandings in general. And now that Plaintiff has just been made aware in the spring of 2017 that Mr. Hsu was part of a fraud which all of the defendants were attempting to perpetrate on the Plaintiff, in addition to the fraud and continuing breach of their joint venture obligations to the Plaintiff by not reimbursing him for all of his hard work, labor and payment of materials over the years, in hindsight, we have no idea what was true and what was false, and now need to explore that through the discovery process, and to  obtain the actual underlying books, records, ledgers, tax returns, etc., so as to determine what the actual profits due Plaintiff are from all of the underlying transactions.

14.  As these individuals were each part of the fraud against the Plaintiff, and as there was not even a good faith effort to comport to corporate formalities, using the individual bank accounts of Mr. and Mrs. Hsu for starters, wholly keeping secret from Plaintiff the actual books and records, etc., this is a classic alter ego entity case warranting a piercing of all corporate veils

7

Case 1-20-01102-jcg    Doc 2-1    Filed 08/28/20    Entered 08/28/20 17:03:31

for all of the corporate defendants so as to determine what Mr. and Mrs. Hsu did with all of the money made from the subject underlying transactions, and as RLCH is the successor entity to all of the individual and corporate transactions underlying the Hsu/Plaintiff joint venture, it should be held under a constructive trust until such time as a full and final accounting is rendered as to all underlying transactions, so as to protect the Plaintiffs interests in this case.

15.     The legal theories of recovery in this case include but are not limited to seeking various declaratory judgments to correct and clarify some of the rights and obligations between Plaintiff and the Defendants, including to correct the percentage interest in the net profits which Plaintiff is entitled to, ground in Mr. Hsu and other's attempt to dilute the Plaintiff's interest in the profits coming from the subject transactions and the financial split which went along with them, attempting to drop the Plaintiff's financial interest in the transactions from 50% to 25% and then again to 16%, in part by the creation from whole cloth of a forged document, purporting to have been signed by the Plaintiff, but which was not, only becoming aware of same very recently.

16.     Additional grounds for relief regard Mr. Hsu and the other defendants' breach of their fiduciary obligations to the Plaintiff, including duties of good faith, fair dealings and loyalty while engaging in pure self-dealing, using the business as his own personal piggy bank, along with Mrs. Hsu, who was the unelected bookkeeper for the business and who took substantial salary without obtaining approval from the Plaintiff for aiding and abetting breach of fiduciary duty, and Mr. Lam, Mr. Cheung and others.  Legal remedies up for adjudication in this case include successor liability, defacto merger, alter ego entities and piercing of the corporate veil, as Mr. and Mrs. Hsu used the four companies that they formed to juggle the purchase and continuous operations of the underlying transactions, without engaging in proper (or any) corporate governance, no meetings, no voting, no providing of information, and generally electing to operate the business without any consultation with Mr. Hsu's 50-50 partner, the Plaintiff in this case.

8

17.     As will be detailed below, while four corporate entities were legitimately formed by lead defendant Joe Hsu purportedly to be used for the future business transactions between Plaintiff and Mr. Hsu, and while Mr. Hsu expressly represented to Plaintiff that these entities would be the vehicles through which he and Plaintiff would purchase, invest, operate, rehabilitate, develop and sell for a profit approximately ten (10) properties in Queens, New York, it has been discovered over the past few months what Mr. Hsu (a highly sophisticated Real Estate Broker, Investor and Developer) actually did was use and manipulate the Plaintiff (a non-sophisticated general contractor) to perform all of the demolition and rehabilitation to the various properties, all the while representing to Plaintiff that their joint venture was intended to engage in a series of buying and selling of realty, using the profits from the first property to buy a larger second property, the profits from the second to buy a larger third property, and so on, until they're where they are today, owning a property that has an overall value of approximately $18 Million.

18.     The understanding between the key players here, Plaintiff and Mr. Hsu, was for a 50-50 share of all net proceeds received from each deal, net proceeds being determined after Plaintiff was paid for all of his time, efforts, extensive labor for demolition and construction (in one case demolishing two single family homes and building 5 single family homes), and then being placed into escrow for the next purchase.  However, Plaintiff was never properly paid for his time, labor, material outlays, etc. over a period of many years, while Mr. Hsu and his wife, Esther Hsu (the company's bookkeeper), refused to provide any accounting of each transaction as they moved forward.

19.     Mr. Hsu would provide Plaintiff with a small bit of money to pacify him when his complaining became too loud, and represent that Plaintiff's share of the net profits were being properly held by he (a licensed real estate broker) and his wife, as they continued to buy properties, rehabilitate them, and sell them for a nice profit...for Mr. Hsu at least.   "Trust me", he would often

Case 1:20-01102-fcg   Doc 1-1   Filed 08/28/20   Entered 08/28/20 17:03:31

state.  This was a mistake, however, as it has been discovered that Mr. Hsu had made substantial profits on the earlier transactions, claiming to have placed them under corporate control, but simply keeping most transactions in his name personally and likely used his personal accounts for funds that were business matters.  In other words, this joint venture with the Plaintiff simply became a piggy bank for Joe and Esther Hsu and others.

20.     And even though Plaintiff and Mr. Hsu had originally agreed for their transactions and the net profits derived therefrom to be split on a 50-50 basis, that Plaintiff would be made a signatory to the corporate bank accounts, and that a proper accounting would be provided for all transactions, in point of fact, no such actions took place, and Mr. Hsu actually brought additional individuals into these transactions without having any advanced discussions with the Plaintiff, without taking a vote, and without any compliance with standard corporate governance; as if Plaintiff wasn't a 50-50 owner.  Here I'm referring to the other individual defendants in this case, including the primary other defendants Kam Ming Lam and Kwan Cho Cheung, who had a more active role in the transactions than the other individual defendants, some of whom have been named merely as they are necessary parties as being shareholders to some of the corporate entities.  But as Plaintiff was kept in the dark on all major decisions, all business matters, it was unclear who had what involvement, for how much, what their duties and responsibilities were, what their relationship to the corporations were, etc.

21.     But to be clear, from the formation of the first corporation, Roel & Hsu Corp., Mr. Hsu simply went about business as if Plaintiff was a virtual employee, despite having not just an equal stake in the properties but being charged with doing all demolition and construction for each of the projects.  It remains an open question what Mr. Hsu actually did in these matters, except to completely ignore any concept of good governance, avoid providing any accounting for the millions of dollars going in and out of their companies, using the defendant entities as nothing

more than shell companies and as the alter ego of Joe Hsu, and possibly for Kam Ming Lam and we suspect Kwan Cho Cheung.

22.     In point of fact, once Plaintiff hired counsel earlier this year, it was discovered that Mr. Hsu actually dissolved all of the entities but one years ago, but interestingly continued to use those entities for business purposes, to maintain bank accounts, writing checks on the dissolved companies, and basically to conduct whatever business Hsu deemed necessary in a grossly illegal fashion.

23.     Moreover, in reviewing the various deeds, mortgages and other related transfer documents for the underlying transactions, there seems to have been a host of illegal activity, mortgage fraud, tax fraud, large cash payments under the table, and other bad acts perpetrated and/or orchestrated by lead defendant Joe Hsu, but also clearly with Kam Ming Lam and we suspect Kwan Cho Cheung and others had knowledge or were otherwise directly involved.

24.     In the end, as a matter of law, we believe we will be able to clearly establish successor entity liability for the entity last standing, RLCH, Inc. and such other entities which Mr. Hsu moved the proceeds from the underlying transactions to, that the entities constituted defacto mergers by continuing the same business operation with the same individuals and conducting the same business, finally leading to a case which cries out for findings of alter ego liability, piercing the corporate veil and unjust enrichment as to those who were part of the fraud and theft as to the Plaintiff in this case.

## VENUE

25.     Venue under New York CPLR 503 is based upon the residence of the Plaintiff and all of the Defendants, as well as the county in which all of the properties at issue exist.

## THE PARTIES

11

26.     At all times hereinafter mentioned, Plaintiff is an individual who resides at 253-02 Leeds Road, Little Neck, New York 11362.

27.     Upon information and belief, at all times hereinafter mentioned, Defendant Joe Hsu is an individual who resides at 62-15 138th Street, Flushing, New York 11367.

28.     Upon information and belief, at all times hereinafter mentioned, Defendant Esther Hsu is an individual who resides at 62-15 138th Street, Flushing, New York 11367.

29.     Upon information and belief, at all times hereinafter mentioned, defendant Roel & Hsu Corp. ("R&H Corp"), was organized under and by virtue of the laws of the State of New York, and was under the completely operation and control of Joe Hsu and Esther Hsu.  This office had its principal place of business care of Joe Hsu at 62-15 138th Street, Flushing, New York 11367.  According to the NYS Department of State, Division of Corporation records, this corporation was formed on January 21, 2005 and was dissolved on February 3, 2009.  Plaintiff was never made aware that Joe and Esther Hsu dissolved or caused this entity to be dissolved.

30.     Upon information and belief, at all times hereinafter mentioned, defendant CHRL Realty Corp. ("CHRL"), was organized under and by virtue of the laws of the State of New York, and was under the complete operation and control of Joe Hsu, Esther Hsu, Kam Ming Lam and Kwan Cho Cheung.  This office had its principal place of business care of Joe Hue at 62-15 138th Street, Flushing, New York 11367.  According to the NYS Department of State, Division of Corporation records, this corporation was formed on February 3, 2006 and was dissolved on May 24, 2010.  Plaintiff was never made aware that Joe and Esther Hsu dissolved or caused this entity to be dissolved.

31.     Upon information and belief, at all times hereinafter mentioned, defendant RLCH Inc. ("RLCH"), was organized under by virtue of the laws of the State of New York, and was and remains under the complete operation and control of Joe Hsu, Esther Hsu, Kam Ming Lam and

12

Case 1:20-01102-fcg   Doc 1-1   Filed 08/28/20   Entered 08/28/20 17:03:31

Kwan Cho Cheung. This office had its principal place of business care of Joe Hsu at 62-15 138th Street, Flushing, New York 11367. According to the NYS Department of State, Division of Corporation records, this corporation was formed on June 26, 2008 and remains active to date.

32. Upon information and belief, at all times hereinafter mentioned, defendant 190-15 48th Avenue Corp. ("190 Corp"), was organized under and by virtue of the laws of the State of New York, and was under the complete operation and control of Joe Hsu, Esther Hsu, Kam Ming Lam and Kwan Cho Cheung. This office had its principal place of business care of Joe Hue at 62-15 138th Street, Flushing, New York 11367. According to the NYS Department of State, Division of Corporation records, this corporation was formed on November 18, 2008 and was dissolved on June 6, 2013. Plaintiff was never made aware that Joe and Esther Hsu dissolved or caused this entity to be dissolved.

33. Upon information and belief, at all times hereinafter mentioned, Defendant Mou Yang Lam ("Lam") is an individual who resides at 148 Piccadilly Downs, Lynbrook, New York 11563.

34. Upon information and belief, at all times hereinafter mentioned, Defendant Kam Ming Lam ("Kam Ming Lam") is an individual who resides at 148 Piccadilly Downs, Lynbrook, New York 11563.

35. Upon information and belief, at all times hereinafter mentioned, Defendant Kwan Cho Cheung ("Cheung") is an individual who resides at 80-30 192nd Street, Jamaica, New York.

36. Upon information and belief, at all times hereinafter mentioned, Defendant Ming Kam Cheung ("Ming Kam Cheung") is an individual who resides at 346 East 13th Street, New York, New York.

Case 1:20-01102-jcg   Doc 7-1   Filed 08/28/20   Entered 08/28/20 17:03:31

37.     Upon information and belief, at all times hereinafter mentioned, Defendant Heong Leeng Lou ("Heong Leeng Lou") is an individual who resides at 14-16 Orchard Street, New York, New York.

38.     Upon information and belief, at all times hereinafter mentioned, Defendant Jin Guo Lin ("Jin Guo Lin") is an individual who resides at 5075 Higgins Drive, Dumfries, Virginia.

39.     Upon information and belief, at all times hereinafter mentioned, Defendant Siu Ling Wong ("Siu Ling Wong") is an individual who resides at 78 Michael Loop, Staten Island, New York 10301. (Kam Ming Lam, Ming Kam Cheung, Heong Leeng Lou, Jin Guo Lin and Sio Ling Wong may sometimes be collectively referred to as the "Other Individual Defendants."

## STATEMENT OF THE FACTS

### A. Manny Roel and Joe Hsu

40.     Manny Roel is an 83-year-old contractor, born in 1934 in the Province of Galicia in Spain, and is now retired from his 60 plus year career as a hard-working laborer.  He learned his trade, most particularly in carpentry, general construction and furniture from a family acquaintance starting when he was about 15 years of age.  Plaintiff, from an early age, was good with his hands.  The family friend, who owned his own business, took on the Plaintiff as an employee/apprentice.  Plaintiff has a basic grade school education and reads and writes at a basic unsophisticated level of English.  He receives Newsday daily and  reads that, mostly for the sports section and has a general understanding.  Growing up, his wife or one of his three children would help Plaintiff with any paper work he had to fill out.  One of his son's in particular, Richard Roel, a banker in New York City, would generally fill out any business forms or checks that need to be filled out or reviewed for understanding.  When he needs to go to the doctor one of his children will go with him to fill out any paperwork.   The town he grew up in was a poor farming community.  He was one of 10 children so when each came home from school they were expected

to help out on the farm. Manny met his wife while she was visiting family in the same province and they were married on December 25, 1958 in Spain.

41.     Plaintiff came to the U.S.in 1959 and became a citizen in 1962. He went into business in 1968 with his brother and brother-In-law.

42.     Defendants Joe and Esther Hsu are from Taiwan but they speak Spanish and would mainly speak to Plaintiff in Spanish. Both Joe and Esther moved from Taiwan to Peru at an early age. Esther, we believe, reached a higher education level than Joe, which is why she handled all of the paperwork, although they never sought Plaintiff's permission. When conversing with Lam and Cheung though it was always in English and Plaintiff had a hard time understanding them and I assume the same can be said about them understanding Plaintiff. When the four of them were together, Joe would speak in Chinese/Mandarin to Cheung and Lam and then in mostly Spanish to Plaintiff. Plaintiff does not speak or read a word in either Chinese or Mandarin.

43.     Joe was and remains a licensed real estate broker with the State of New York, having been so, upon information and belief, for greater than fifty (50) years, as well as being a real estate investor and developer. He is a very sophisticated businessman. Esther was the unapproved bookkeeper for all of the projects underlying this matter except for Barclays, where Joe, Cheung and Lam apparently appointed Esther – still without my permission -- , despite not being approved as such for any of the other projects, and in any case, as Joe conveyed that "my office" will do all of the necessary paperwork as part of my consideration and at no charge to our joint venture. This was part of his consideration, as Manny had the hard part. He is the one who got up before dawn and worked from dawn to dusk on the projects, hiring other laborers and contractors to work under him or with him to do the various construction projects, which included complete gut rehabilitation projects to various homes.

   B.  **The Agreement Between Manny and Joe (and later, adding Lam and Cheung)**

15

Case 1:20-01102-fcg Doc 1-1 Filed 08/28/20 Entered 08/28/20 17:03:31

44.     Manny and Joe met through a mutual business acquaintance in the fall of 2004

45.     The joint venture/partnership agreement between Joe and Manny started in or around January of 2005, when Joe had proposed to form R&H Corp, whereby Joe and Manny would be 50% shareholders in the company.  Through this vehicle, all future purchases of realty would be made, bank accounts opened, with both parties being signatories, and all net profits would be split after payment to Manny for his time, labor and material outlays to rehabilitate the purchased properties.  In return, Joe would not receive a broker's fee for the various sales and purchases of real estate – those funds would remain in the corporate coffers – and Joe's office (including via Esther) would take care of all of the scant paperwork required to manage the finances of the properties.  In other words, Manny would be the real laborer, working from dawn to dusk on the projects, and in consideration for same, Joe and his wife Esther would do what little paperwork was needed to keep track of billing, deal with the accountant to file tax returns, and to maintain as fiduciary, all of Manny's profits, as well as Joe's profits, to be used as a so-called 'spill-over' into the next larger deal.  The idea of the venture was to start small, buy, rehabilitate and sell property number one, make a nice profit, buy a second larger property, rehab and sell that property and so on, in ever increasing costs for the purchases, meaning that the value of the venture should continue to rise with each and every transaction.

46.     Joe and Esther were the direct fiduciaries to make sure that Manny was paid for his costs, his labor, the material outlays he paid out for the company, and to properly hold in escrow all of the net profits received by Manny and Joe for the next deal.

47.     The final part of the agreement was for Joe and Esther's agreement to keep Manny regularly paid for his labor and materials and outlays, including but not limited to, so Manny could pay his employees weekly salaries, and finally to provide him with copies of all incorporation documents, board of director meetings, minutes, bank account statements, closing statements for

16

Case 1:20-01102-jcg   Doc 11   Filed 08/28/20   Entered 08/28/20 17:03:31
INDEX NO. 709652/2017
RECEIVED NYSCEF: 12/28/2018

all transactions, loan documents, deeds, tax returns and all other related documentation so that Manny could independently verify for himself that Joe and Esther were acting as good faith stewards and fiduciaries for Manny, as well as for themselves meaning for Joe (Esther was in essence a silent partner on Joe's side, but received quite a bit from each transaction as we have only recently found out, roughly $6000 per deal (this figure varied per deal we believe but have yet to been granted access to the books and records), for a scant hour per week or per month to maintain the finances for the projects, which was not complex.  But that breach of fiduciary duty and aiding and abetting Joe to breach his fiduciary duty to Manny is discussed in the causes of action below.

48.    Despite best efforts, however, neither Joe nor Esther would hold meetings, or engage in any corporate formalities whatsoever, and in fact never even transferred properties from Joe's personal name to the corporations that they formed for that purpose.

49.    In still other instances, we have recently discovered that, despite dissolving CHRL in 2010, and R&H in 2009, Joe and Esther continued to use those entities as if they were active legal entities, continued to use bank accounts in those names and otherwise engaged in nefarious and illegal conduct exposing all parties to the risk of holding out companies as active when they were in fact dissolved, and by those very individuals, Joe and Esther.

50.    In any case, this was in essence the joint venture/partnership agreement between Joe and Manny.  And while Joe actually prepared and provided Manny with a draft agreement which is roughly akin to the terms which they actually performed as rights and obligations towards one another, Joe refused to sign any written agreement to memorialize their understanding. Perhaps he believed he could have more flexibility in 'cooking the books' with his wife Esther, if there was no written agreement.  But joint ventures, oral partnerships, etc. are fully enforceable as well, especially when the parties did so much performance together for so many years – in this

case from 2005 through the date hereof where there remains one property owned by some percentage interests by Manny, Joe, Lam and Cheung, namely, the Barclay Project, which Manny and Joe both intended to sell, but a recent dispute has also arisen as some of the partners want to convert the building into a condominium while other partners do not. And in the case of a condominium conversion, all principals, shareholders, must agree to the conversion or the Office of the Attorney General will not approve the plan. Moreover, it is my understanding that some of the principals used the word "condominium" rather loosely, not really understanding that they could not simply sell units, one by one, without properly and legally converting the entire building to a condominium or cooperative through the filing of a major offering plan with the Attorney General. They wanted to set up a management company and simply sell units without going through the formal procedures required by the State of New York, Office of the Attorney General.

51.     So with clean hands, Plaintiff Manny Roel comes to Court, both individually and derivatively on behalf of the various corporate entities, seeking relief in the form of pecuniary damages and various equitable relief in the form of declaratory judgment determinations so that the rights and obligations among the parties including the Other Individual Defendants are clear.

52.     Paragraph 44-51 shall collectively be referred to as the "Agreement."

**C. The Underlying Projects**

**(i)     "The Corona Project"**

53.     The Corona Project was the first project between Manny and Joe/Esther. It involved the properties known as and located at 50-34 and 50-38 103rd Street, Corona, New York. Joe personally took title to these properties by deed dated December 15, 2004, and instead of transferring the properties into R&H Corp, as agreed, decided to keep the property in his own name, contrary to the joint venture\partnership agreement. This was of course not the understanding between Joe and Manny, nor was Manny made aware of this failure by Joe. The

purchase price was $400,000, and Joe insisted Manny pay $228,254 for his ½ share of the properties.

54.     Manny's work began, spending approximately 4 months engaging first in a full demolition of the interior of the existing one family residence, down to the frame, then built a fence around the entire perimeter of both lots and miscellaneous other construction work.

55.     For his efforts, Manny was not paid for most of his labor and material outlays, in excess of $75,000, which he should have received per the agreement with Joe.

56.     After Manny's great rehab job on the property, according to transfer records on ACRIS, Joe sold the property for $850,000 on December 19, 2005.  However, just three days later, the 3rd party purchaser was given a mortgage for $1.134 Million, roughly $300,000 above the purchase price, which means that the property itself would have had to have a fair market appraised value of approximately $1.5 Million.

57.     The sale of the Corona Project, conducted exclusively by Joe and Esther, clearly involved the payment of cash 'under the table' in order to avoid having to credit Manny's capital account, which Joe and Esther were supposed to be holding for him a larger sum.  It is unclear pre-discovery what the actual purchase price for this project was, but it had to be significantly more than the stated purchase price in order for a mortgage to be placed on the property for $300,000 higher than the purchase price itself.

58.     Finally, to add insult to injury, Joe took it upon himself to take a $50,000 real estate brokerage fee at the closing of the sale, without permission from his partner and without any writing authorizing same, pursuant to Article 12-A of the Real Property Law.  Part of the agreement between Joe and Manny was that Manny would be doing all of this construction work, day in, day out, while Joe would have to do a very small amount of work, namely, organize the closing through counsel for Joe and Manny, namely, Maureen, Carroll, Esq.  There was no agreement for Joe to

milk the company by taking brokerage fees, and in fact the agreement was for him NOT to take brokerage fees, that that was part of his sweat equity. And to further add insult, it has been discovered that Esther took at least $6000 for her "bookkeeping services" for this transaction, likewise without Manny's consent, and which also was supposed to be the sweat equity that Mr. and Mrs. Hsu put into the joint venture.

59.     As Joe/Esther never provided a closing statement, tax returns, or any accounting for this project, it is undetermined how much of the profits which far exceed the $450,000 on paper should have been tendered to Manny, or in this case, credited to his account which Joe and Esther were the fiduciaries of. But for this particular transaction, there is simply no question that there was cash paid from the buyer in December of 2015 to Joe, *under the table*, in order to help Joe avoid having to pay his partner his fair share of the actual sales price and perhaps for other nefarious reasons. A full accounting is required here.

**(ii)     "The Flushing Project"**

60.     The Flushing Project was the second project between Manny and Joe/Esther. It involved the property known as and located at 61-30 138th Street, Flushing, New York. This project was also a 50-50 split between Joe and Manny.

61.     Again, Joe personally took title to the property, rather than placing the property into R&H Corp, as agreed, by deed to him personally dated April 8, 2005 December 15, 2004. The purchase price was $548,000.

62.     Manny's work began, spending 10 months converting this one story one family residence into a two-family residence, with a complete interior demolition and rebuilding. For reasons unknown, by deed dated November 21, 2006, Joe transferred title to the property into Manny's name, with Joe claiming he had "too many properties in my name". Again, Joe was supposed to handle the business end of these transactions but he would not explain the reason for

the actions taken and did all decisions on his own, despite having a co-equal obligation to have Manny fully understand and participate in all decisions.

63.      By deed dated November 7, 2007, Joe/Manny sold this property for $900,000, with joe once again taking a brokerage fee, which he was not allowed to do, with Esther once again taking exorbitant bookkeeping fees, which she was not allowed to do, and without any clear accounting provided to Manny, who again was owed a substantial sum for the labor and work over the many months it took to do this construction work.  Once again, a full accounting is required.

    **(iii)**      **"The Manilla Street Project"**

64.      The Manilla Street Project was the third project between Manny and Joe/Esther, also involving LAM, Cheung and 190 Corp.  It involved the property known as and located at 51-89 Manilla Street, Queens, New York.  This project was a 25% split four ways with Joe, Manny, Lam and Cheung.

65.      For this project, Lam took title for $50,000 on January 24, 2008, transferring the property to 190 Corp for zero consideration as his part of the project. This was an extensive project, demolishing a one family residential home and erecting from scratch a four-family residential property which took Manny approximately 7 months to complete.  Needless to say, Manny's labor and expenses for this project were extensive, well over $150,000, for which he has not been paid. The 190 Corp did very nicely, however, and sold the property on March 5, 2010 for $1,468,106. Here again, Joe took a huge brokerage fee which he was not permitted to do as that was part of his equity for these transactions and here again, Esther took sizeable bookkeeping fees.  We have no idea what other creative fees Joe and Esther took for any of these transactions, as they have refused to show the actual books and records to our forensic finance experts despite demand year after year.

66.     Purportedly, Manny's share of this project, which should have been about $750,000 after receiving his labor and material costs and for his share of the profits were being held by Joe and Esther but they would regularly avoid Manny's requests to meet and go over the venture's finances.  An accounting is required.

(iv)    **"The 48th Avenue Project"**

67.     For this project, 190 Corp purchased this property (190-15 48th Avenue) on January 8, 2009 for $600,000.  Lam signed for 190 Corp.  For this project, Manny spent about 6 months doing the build-out, with roughly $300,622 in labor and materials, none of which were paid for. This project involved the demolition of a one family residential home and the building of a two-family residence. This project was a 25% split four ways with Joe, Manny, Lam and Cheung.

68.     While the sale of the property was by deed dated May 18, 2011 for $997,885, cleverly orchestrated by Joe to be under $1 Million to avoid extra taxes, it has recently been learned that Lam was paid an additional $150,000 in cash under the table as part of the closing price, above the $997,885.   Again, without permission, Joe and Esther took exorbitant brokerage fees and bookkeeping fees to continue to milk the companies which were in their exclusive control.

(v)     **"The 46 Avenue Project"**

69.     This project involved the property known as and located at 211-22 46 Avenue, Queens, New York and was a four-way split among Lam, Roel, Hsu and Cheung.  190 Corp purchased the property on February 26, 2009 for $999,500, which was an existing one family residence which was demolished with Manny building two 2-family residential home.

70.     Nice profits were made by the group here.  One sale for $1,118,000 was made on May 4, 2011 with a second sale on May 12, 2011 for $1,178.940.

71.     Manny's work began, spending roughly 12 months on the job.  Manny's labor and materials, the work that actual generated the profits for the group, were again not paid for in full,

with his estimation being owed $132,815 aside from his 25% share of the profits, which was approximately $1.3 Million in gross profits. Here again, Joe and Esther, controlling the cash for these transactions through the various companies formed, paid themselves handsome brokerage and bookkeeping fees, along with others we suspect at this point.

72.     It remains unclear how much was made from these highly profitable ventures as Joe and Esther continued to put off Manny from truly having an exploration of the books and records with his accountant and forensic expert.

**(vi)     "The Sanford Avenue Project"**

73.     This project involved five parcels of land, 149-18/22/26 Sanford Avenue and 42-14/18 149th Place. The property was purchased under Joe's name directly on June 14, 2006, and was purchased for the group of four principals for $2.35 Million, taking out a mortgage from the church who sold them the property.

74.     For this project, they demolished the existing property which were two 1-family homes, building foundations and five 2-family homes, from stem to stern. This was Manny's hard work and took over 1.5 years to build. Throughout 2008, the partners did well and sold all of the properties for approximately $4,437,000, again enjoying a profit of over $2.1 Million, with Manny supposedly getting 25% of that plus the return of his layout for building materials and his labor costs. He did not get those funds but Joe surely took huge brokerage fees for each of the 4 or 5 sales, and his wife took her bookkeeping fees which Manny had never agreed to and again was supposed to have been part of the Hsu's sweat equity in these deals, along with Joe's brokerage fees. Again an accounting is required here.

**(vii)     "The Bayside Project"**

75.     This project was for 13-71 209th Street, Bayside, New York, and involved Manny converting a one family home into a two-family home, removing a replacing the existing roof and

other major construction which took 11.5 months to complete. This purchase was made by Joe personally for R&H Corp. This was supposed to be a 50-50 split with Joe and Manny. The venture purchased the property on December 6, 2005 for $720,000. Joe sold the property on February 2, 2007 for $995,000. Noting the pattern of sales prices close to but not past $1 Million, there is great suspicion, and upon information and belief, that many of not most of the sales included cash under the table style shenanigans, to avoid paying Manny alone in some cases and to avoid paying Manny, Lam and Cheung property in cases that involved 4-way splits.

76.     Here again, Manny was not paid for most of his labor and materials, while Joe and Esther continued to take whatever they pleased at the closings, failing to provide closing statements each and every time Manny would ask for same. Aside from what was due from the net profits for this deal, it is estimated that Manny's project labor and expenses exceeded $175,000. An accounting is required here.

**(viii)   "The Rushmore Project"**

77.     The Rushmore Project was a 50-50 split between Joe and Manny and started with the purchase on November 18, 2005 with Joe putting the property in Manny's name as he again claimed to have "too many properties in my name" so put it in Manny's name. The purchase price was $600,000. This project involved the demolition of an existing home and the construction by Manny of a one family home, which at Joe's insistence consisted of a steel frame and many other intricate details and finishing's. It took roughly 10 months to erect.

78.     The property was sold on June 21, 2010 for $970,000, and interestingly, while the property was in Manny's name, Joe instructed Manny to sign over many of the checks issued to him at closing, again as Joe and Esther kept tight control over what was supposed to be everyone's money, but were clearly only looking out for Joe and Esther, as Manny hasn't received a penny

Case 1:20-01102-leg   Doc 7-1   Filed 08/28/20   Entered 08/28/20 17:03:31

for this project, and in fact, Joe and Esther claimed they "lost money" on this and some of the other projects, which was impossible. An account is required here.

### (ix)   "The Little Neck Project"

79.    Here again, Joe put this project in Manny's name by deed dated July 8, 2008, for a purchase price of $285,000. Manny engaged in a complete gut rehabilitation of the interior and exterior of a single-family home, which took him about 7 months to complete. On September 14, 2009, the property was sold for a nice profit of $550,000, almost double the purchase price. Here again, Joe and Esther took their fees at closing, but Manny was not paid, even though checks at the closing were written largely to Manny, except for one check which Manny was *allowed* to keep in the sum of $133,0000, Joe had him sign them over and deposited them in one of the corporate accounts that they were using in no particular order. An accounting is required.

### (x)   "The Barclay Project"

80.    By deed dated July 11, 2008, the group under RLCH purchased 144-73 Barclay Avenue for $1.2 Million. On March 6, 2012, the group under RLCH purchased the adjacent property known as 144-69 Barclay Avenue for $1.1 Million. The low-rise structures were demolished and this was to be the group's largest project, a 7-story building with a lobby, having approximately 3-4 apartments per floor. The plan was to then sell the combined assemblage at the end. This time, the group hired a general contractor to do the demolition and construction with Manny overseeing construction for the group.

81.    Manny's personal investment in this property is roughly $2 Million in monies paid to Joe and Esther to be applied to the construction costs of the project. According to the scant few records that Joe and Esther (and Lam) provided to Manny, from the money Joe and Esther were holding for Manny, they put $250,000 on Manny's behalf towards the purchase of 144-72 Barclay when that property was purchased in 2008 for his 25% interest in this deal, and put an additional

Case 1:20-01102-jcg   Doc 11   Filed 08/28/20   Entered 08/28/20 17:03:31

$266,000 on Manny's behalf from the RLCH account towards the purchase of 144-69 Barclay when that property was bought in 2012 for his 25% interest in this deal, and then combined with the 2008 purchase. For purposes of this lawsuit, however, it is critical to remember that this last payment for Manny in particular, the $266,000 payment in 2012, makes clear that Joe and Esther continued to hold untold funds for Manny which have never been accounted for. Furthermore, to date, Manny has continued to pay funds and "capital calls" (which I put in quotes as nothing is in writing, no capital calls, etc. It seems someone would just call Manny and say, put $50,000 into the bank account, put $100,000 into the RLCH bank, etc., for the building's construction costs. Again, no backup, no explanations. To date, Manny has put in upwards of $1.8 Million of his own cash into the Barclay Project to maintain his 25% stake in the Project.

82.     It is estimated that the combined property is worth upwards of $16 Million to date. While some of the 4 partners want to file for a condominium, the key partners, Joe and Manny who started this entire venture wanted to sell the building outright and not as a condominium, given all the headaches involved in selling unit by unit. Plus, Manny suspected Joe would just use this property as a money machine to take a brokerage fee on every sale.

83.     There remains a dispute as to what to do with this property and as to what Manny's percentage interest in RLCH is, as Manny has been a 25% partner on all deals in which the 4 partners worked together, recently a document was discovered, dated December of 2008 that purports to reassign the percentage interests among the 4 partners and brings in some family members from Lam and Cheung, who we now understand were more directly involved in pushing for the condo than Manny understood. The fact that they spoke Chinese only and Manny spoke Spanish primarily did not help matters. Thus, one of the claims seeks a declaratory judgment that the document did indeed include a forged signature of Plaintiff Manny Roel, and in any case, this

26

document does not dilute Manny's split for one of the two parcels which now comprise the Barclay Project.

84. For this project as well, a full account is warranted as well as a current appraisal.

### D. Conclusion as to the Underlying Projects

85. These underlying real estate projects were all part and parcel of the larger joint venture/partnership between Manny and Joe in several of the projects and between Manny, Joe, Lam and Cheung in the other projects. It is estimated that through the lack of payments for labor and materials and for Manny's 50% share in various projects and 25% share in the other projects, that he is owed approximately $8 Million, half of which alone would be his share of the Barclay Project.

86. Through the first five years, Joe would dish out some payments to Manny to keep him happy, so to speak, keep him quiet and to not get lawyers involved. He claimed all of his money was being protected by Joe and Esther, and that the money was moving from project to project in a proper manner and properly accounted for Manny's share to the dollar. But he refused to show any of the backup for these purported accountants, which Joe had originally agreed to do as part of their original joint venture understanding. Accountings and showing where the money is was all part of the original joint venture, an express term. But Joe and Esther always had fine excuses for why it was a bad time this time and that year etc.

87. Moreover, while the corporations, R&H Corp, CHRL and 190 Corp were indeed properly formed, they were used exclusively by Joe and Esther, who did not hold any meetings, conducted no votes, opened and closed bank accounts at their whim, paid out funds without any oversight, and generally operated these corporations as their own alter ego. Moreover, it was just discovered this spring by Plaintiffs attorney, who reviewed the filings with the NYS Department of State that all of these 3 companies were dissolved years ago, despite failing to so advise Manny,

telling him were his money was being placed, etc., but all presumably going to the sole remaining entity which is currently active – RLCH, INC. This is the successor to each of these entities and to all of the proceeds from all of these underlying transactions which were taken largely in the personal name of Joe, some in Manny's name (under Joe's exclusive control and watchful eye), so that RLCH is now the successor entity to all of the underlying transactions, to all of the net profits that Manny is entitled to, to all of the monies that those prior entities and that Joe personally owes Manny in failing to tender his share of profits from these 10 transactions.

88.    But to be clear, these projects were all part and parcel of a single joint venture, where the money was supposed to be building year after year with larger and larger projects. And to this extent, the group succeeded as they are now the owners of the Barclay Project, which has an estimated net value of $16 Million, but a current appraisal should be had.

89.    Bottom line, this case is about the fraud and the manipulation of an unsophisticated individual, Manny Roel, who was on the other hand, a real artisan, contractor and good man all around. He was taken advantage of by Joe and Esther, and by Lam and Cheung, who used Manny's business inexperience plus their language barriers (some documents that they had Manny sign were in pure Mandarin) to their advantage, effectively depriving Manny of the additional several million of his net profits from the first nine projects, along with most of his labor and material costs, while at the same time, Joe and Esther used their exclusive control of these companies to take all of the fees they could even try to justify. But we will need to conduct full discovery in order to determine the extent of the fraud and how much exactly is due Manny for his years of hard work, that made all of the partners wealthy in these matters.

90.    Finally, we note this is a suit brought by Manny individually and directly but also as a derivative action on behalf of the various (and now dissolved) companies, for the return of

funds that Joe and Esther improperly and without color of authority of anything in writing pillaged the companies for what we believe will show in the millions.

91.     Manny seeks by this action to be made whole both as a matter of law and equity. The kind of bad faith, breach of contracts and understandings, and gross self-dealing such as took place in this case must not be countenanced by a Court.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract: The Agreement)

92.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

93.     This joint venture and/or partnership, however it is to be labeled, was indeed a valid and enforceable agreement between the parties.  Reference is hereby made to Paragraphs 44-51 above for the details of the Agreement.

94.     The many breaches of the Agreement by Joe (aided and abetted by Esther, see below), and with Lam and Cheung are manifest.

95.     Contrary to the Agreement, Joe failed to put all property purchases, except for Barclay and several in 190 Corp in the names of any of the corporate defendants.  Joe and Esther failed to provide any accounting whatsoever throughout the entire term from the start of these ventures in January of 2005.  Joe and Esther and Lam and Cheung failed to pay Manny his proper return for labor and materials and other outlays and expenses incurred for the projects, while earning for the group sales and profits in excess of $10,000,000 excluding the Barclay Project.

96.     Contrary to the Agreement, Joe and Esther took brokerage fees, bookkeeping fees and other fees which were expressly disallowed by the understanding of the parties, and was supposed to be the sweat equity put into the underlying transactions by Joe and Esther.  Other fees we assume were also taken without permission, but which we won't have the details of until

29

discovery has been fully conducted, including in particular, for all of the paperwork for each and every underlying transaction.

97.     The importance of this is that these ten projects were not separate projects in and of themselves, but were used to build and group the venture's coffers, leading eventually to the ability to make the Barclay Project purchases in 2008 and 2012 and begin building that project, which is all but done at this point, worth approximately $16,000,000 in and of itself.  It is owned exclusively by RLCH.

98.     As Manny's share was 50% for some of the projects and 25% for most of the projects including Barclay, Plaintiff seeks an amount to be determined at trial but believed to be in excess of $3 Million for all of the projects now sold and gone, with the exception of Barclay, which is still owned by RLCH, plus interest from the time of the sale of each project.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Unjust Enrichment)**

99.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

100.     As a pleading in the alternative as allowed under the CPLR, Plaintiff claims that Joe, Esther, Lam, Cheung and the Other Individual Defendants have been unjustly enriched at the Plaintiff's expense, as set forth above, in an amount to be determined at trial but believed to be in excess of $3 Million for all of the projects now sold and gone, with the exception of Barclay, which is still owned by RLCH, plus interest from the time of the sale of each project.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Tortious Interference with Business Contract/Relations by Esther,**
**Lam and/or Cheung and the Other Individual Defendants)**

101.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

102. Plaintiff claims that Joe, Esther, Lam, Cheung and/or the Other Individual Defendants have tortiously interfered with the Agreement and/or business relations between Joe and Manny without Manny's knowledge and consent, causing him to be owed an amount to be determined at trial but believed to be in excess of $3 Million.

103. Unbeknownst to Manny, side deals were created and entities created, including for example for the company known as CHRL. This company, of which Manny was a 25% owner, also included Joe as a 25% owner and Lam and Cheung and their families as a 25% owner. There was no agreement that Manny signed, however to open this company, or approve its existence. CHRL never owned any of the properties relating to the Projects at issue above, yet it appears that Esther, Lam, Cheung and the Other Individual Defendants, upon information and belief, directly benefited from the bank account opened in the name of CHRL by Joe and Esther.

104. To be clear, CHRL never owned or had title to any of the subject properties, yet these parties which tortiously interfered with the Agreement and with Joe and Manny's business relationship received payments the amount of which is completely undetermined at this time, but they certainly had no right to as CHRL owned NOTHING, except we believe was used as the slush fund for monies received from all of the Projects by Joe and Esther to dole out funds to these parties without Manny's knowledge and consent, monies we believe were ultimately Manny's.

105. Accordingly, judgment is sought against each of these party defendants in an amount to be determined at trial but believed to be in excess of $3 Million.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraud)

106. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

107. By way of example, the Corona Project is probably one of the best examples of cash paid under the table, unbeknownst to the Plaintiff and at Plaintiff's expense.

108. While the Corona Project sold for $850,000, providing a gross profit to Joe and Manny of $450,000, just three days after the sale, the purchasers obtained a mortgage in the sum of approximately $1.2 Million, meaning that the actual value had to be at least $1.5 Million to obtain that mortgage, based upon conventional terms and conditions.

109. Joe clearly represented to Manny that the $850,000 was the actual purchase price, but this has turned out to be false and the monies paid under the table for the "actual" purchase price remain undetermined at this time.

110. Manny clearly relied on the oral representations made by both Joe and Esther that the $850,000 was the actual purchase price by not challenging same, and simply believing that there would be no nefarious behavior such as cash payments under the table. The damages incurred by Manny include the differential in the Corona Project and in the other projects between the listed purchase price on the deed and/or RPT forms and the actual monies paid by the 3rd party purchasers.

111. Declaring that the price was $850,000 when it was not could be considered either a material misrepresentation or a material omission of a material fact. But either way, Manny relied on same to his detriment, and clearly all of this nefarious behavior was done with intent, also known as scienter for purposes of pleading a fraud claim.

112. The fraud also included taking brokerage fees and fees for bookkeeping and for other matters, without disclosing that to Manny (and Lam and Cheung in some cases), and also by hiding the fraud by failing and refusing to grant access to all of the books and records of the venture being held by Esther and Joe.

113. Plaintiff claims that Joe, Esther, Lam, and/or Cheung have committed fraud at Plaintiff's expense, as set forth above, in an amount to be determined at trial but believed to be in

FILED: QUEENS COUNTY CLERK 12/28/2018 09:44 AM
Case 1:20-01102-fcg   Doc 1-1   Filed 08/28/20   Entered 08/28/20 17:03:31   INDEX NO. 709652/2017

NYSCEF DOC. NO. 363                                      RECEIVED NYSCEF: 12/28/2018

excess of $3 Million for all of the projects now sold and gone, with the exception of Barclay, which

is still owned by RLCH, plus interest from the time of the sale of each project.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty, Duty of Loyalty, Duty Not to Self-Deal, Duty of Good Faith and Fair Dealing Relative to the Agreement)

114.    Plaintiff repeats and realleges each and every allegation set forth above as if fully

set forth herein.

115.    Joe, Esther, Lam and Cheung were clear fiduciaries to Manny in these matters, as

set forth above.  Lam and Cheung were fiduciaries in particular relative to the Barclay Project, but

we also recently learned that Lam has been the treasurer for most of the underlying projects,

working on the books with Esther, so they all clearly had and have a fiduciary duty to Manny in

connection with all of the underlying projects along with Barclay.

116.    As Manny has received approximately $650,000 for all of his interests in the

underlying projects, while being entitled to more than $3 Million, Joe, Esther, Lam and Cheung

have breached their fiduciary duties to Manny by not ensuring he received what he was entitled

to.  Moreover, by failing to engage in any corporate governance, voting, meetings, any compliance

whatsoever with the Business Corporation Law for any of R&H Corp., 190 Corp., CHRL and

RLCH, and by taking monies for real estate brokerage fees without permission and without a

written agreement in violation of Article 12-A of the Real Property Law, and taking exorbitant

bookkeeping fees without consent, again, this is all self-dealing and forms the basis for alter ego,

successor liability and piercing the corporate veil, discussed below under the declaratory judgment

claims.

117.    Plaintiff claims that Joe, Esther, Lam, and/or Cheung have breached their fiduciary

duty, duty of loyalty and duty to refrain from self-dealing, along  with their Duty of Good Faith

and Fair Dealing at Plaintiff's expense, as set forth above, in an amount to be determined at trial

but believed to be in excess of $3 Million for all of the projects now sold and gone, with the exception of Barclay, which is still owned by RLCH, plus interest from the time of the sale of each project.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty, Duty of Loyalty and Duty Not to Self-Deal)

118.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

119.    Under the facts set forth above, it is clear that Esther, Lam and Cheung aided and abetted the main fiduciary in this case, namely, Joe Hsu, at the expense primarily of Manny, although we also believe that Lam and Cheung may have also been victims, to an extent, on some of the projects, due to the manner in which Joe and Esther kept their books and records.

120.    Plaintiff claims that Esther, Lam, and/or Cheung have aided and abetted the breach of fiduciary duty, duty of loyalty and duty to refrain from self-dealing that took place in this case at Plaintiff's expense, as set forth above, in an amount to be determined at trial but believed to be in excess of $3 Million.


## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Derivative Claim by Manuel Roel, as Shareholder of R&H Corp., CHRL, 190 Corp. and RLCH against Joe and Esther and Lam)

121.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

122.    Manny is a 50% shareholder of R&H Corp., and a 25% shareholder of CHRL, a 25% shareholder of RLCH and a 25% shareholder of 190 Corp.

123.    This cause of action is brought derivatively against Joe and Esther Hsu, and Lam, on behalf of R&H Corp., CHRL, 190 Corp., and RLCH to redress the plundering of these entities

by Joe and Esther from the Corona Project through the Barclay Project, all ten projects and to seek the disgorgement and return of all funds improperly taken. Joe has purported and held himself out to the world as the President of all of these corporations and Esther likewise has done so as the corporate bookkeeper. Lam has held himself out and acted as the Treasurer.

124. This derivative action is brought to protect the interests of these corporate defendants from the misfeasance and malfeasance of the companies officers and directors, as set forth above.

125. As Manny has been attempting to gain access to the full books and records of each of these companies, along with all of the other projects involved here, including those taken in the names of Joe and Manny individually – as those were also part of this joint venture, making a demand on Joes, Esther or Lam are futile, as Manny has been trying to get proper access for his accountant and other professionals for quite some time and he is always put off with excuses, "we're too busy right now" and other outrageous excuses. To be more detailed, year after year, since 2007, Manny has been trying to get access and Esther and Joe have essentially refused.

126. Upon information and belief, the funds taken as real estate brokerage fees by Joe and bookkeeping fees by Esther, without permission or consent or a vote, are the largest claims under this derivative suit. Moreover, taking any funds like this was contrary to the Agreement, as this was the swear equity that Joe and Esther were required to do as it was not very time consuming. Meantime, it is estimated that this depletion of funds may approach $1 Million or more upon completion of our forensic accounting, but that can't be determined precisely at this time.

127. Accordingly, Plaintiff seeks judgment against Joe, Esther and Lam, as a shareholder and in a derivative capacity for the subject corporate defendants, in an amount to be determined at trial but believed to be in excess of $1 Million.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Declaratory Judgment: Fraud in the Execution, Forgery

Case 1:20-01102-fcg   Doc 1-1   Filed 08/28/20   Entered 08/28/20 17:03:31

128.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

129.    Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon a justiciable controversy in this matter.

130.    As set forth above, Plaintiff's attorney was given a document in April of 2017 by counsel for Joe Hsu in connection with a motion for a change of venue.  Plaintiff originally filed this case in New York County in March of 2017 as some of the Defendants resided in New York, but in consultation with counsel for the defendants, Plaintiff's counsel agreed to withdraw that lawsuit and refile this suit in Queens County Supreme Court.

131.    But in receiving this document dated December 23, 2008 purportedly executed by and between Joe, Manny, Lam, Cheung and some of the Other Individual Defendants, a dilution took place of Manny's interest in RLCH, dropping his interest from 25% to 16%, which would change his equity interest in the Barclay Project by almost $2 Million.

132.    The thing is, Manny never signed that document.  Counsel for Plaintiff has gone through this with Manny and we have now retained a forensic handwriting expert and it appears that someone has forged the signature of Manny for this document regarding the percentage interest in Barclay.  We address this in our next cause of action for a declaratory judgment on the issue.

133.    In any case, this forged document only involved one of the two Barclay properties, namely, 144-73 Barclay, which was purchased by the group in 2008, even if it wasn't some forged document and thus void ab initio.  This document does not address anyone's interest in the adjacent and now combined property known as 144-69 Barclay Avenue.

134.    As Manny Roel did not sign this document by his own hand, it is a fraud in the execution and void ab initio, and we seek a judgment declaring same to be the case.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Declaratory Judgment: Manny Owns 25% of RLCH)

135.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

136.    Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon a justiciable controversy in this matter.

137.    From the start of the venture, Joe and Manny being the first two parties in the venture, the net profits were to be split on a 50-50 basis.  Thereafter, with the formation of CHRL and RLCH, Manny and Joe's interest both remained 25% and 25% with Lam and Cheung (or some of their family members – the Other Individual Defendants) receiving the other 50% interest.

138.    Lam expressly confirmed Manny owned a full 25% of RLCH as recently as late 2016 and in 2017 when they spoke, while this December 23, 2008 document purports to chop and dilute Manny's interest to 16%.

139.    Manny never agreed, nor would he have to reduce his percentage interest in the RLCH Barclay Project, never signed a document which would reduce it, and even the purportedly valid document (which is a forgery of Manny's signature) was valid, it does not include a reduction of Manny's interest in the 144-69 Barclay Avenue property, which is now combined with 144-73 to form the Barclay Avenue Project, a single 7-story property.

140.    Accordingly, we pray for a judgment declaring Manny to be a full 25% owner/shareholder of RLCH and a full 25% owner of the Barclay Project.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Declaratory Judgment: RCLH is Alter Ego and Successor Entity of all Projects, and of earlier corporations, CHRL, R&H Corp and 190 Corp)

141.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

142.     Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon a justiciable controversy in this matter.

143.     Four corporations were formed by Joe and Manny and then with Lam and Cheung – R& H Corp., then CHRL, then RLCH and then 190 Corp.  All of these corporations were alter ego entities as mere instrumentalities of Joe, Lam, Cheung (and even Esther), failing to engage in any corporate governance, by knowingly using the corporate bank accounts for some of these entities even though they were dissolved years easier, and by engaging in fraud and breach of the Agreement, as set forth herein.  Moreover, even though some of the project remained in the names of Joe (or even Manny, as Joe's exclusive direction and control), and were sold by them with the monies going back to Joe and Esther under their total dominium and control, these transactions (through individuals) were also part and parcel of the chain for successor liability.

144.     Presently, the only remaining entity with any value is RLCH which owns the Barclay Project.  All of the prior transactions/projects, through the individuals or through the entities were mere continuations of the Agreement, continuations of joint venture started by Joe and Manny.  But as the money was syphoned from one project to the next, the next project was a defecto merger from the last project – which through individual or entity – all leading to the final project – the Barclay Project – which has a significant value.

145.     Accordingly, based upon the facts, as the companies were not employed as real entities, as they defacto merged one into the other, and as the money NOT paid to Manny just continued to move from project to project on paper, the final project left standing, if you will, the final project which has a value in excess of $16 Million, must be held to account for whatever damages are found due Plaintiff in this case, under the doctrine of successor liability, alter ego liability.  We seek a declaratory judgment as stated.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Declaratory Judgment to Pierce the Corporate Veil as to Joe, Esther, Lam and Cheung)

146.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

147.     Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon a justiciable controversy in this matter.

148.     For the reasons stated above, Joe, Esther, and potentially Lam and Cheung must be held liable personally for any and all damages due Plaintiff under the Doctrine of Piercing the Corporate Veil, again because the corporations in this case were mere alter egos of these individuals, and as Joe and Esther in particular maintains complete dominium and control over all business and financial matters.

149.     As a matter of equity, upon the facts presented, this is an extreme case of abuse of an individual, and through alter ego and successor liability, these individuals should also be held personally liable and the veil pierced for all of the projects, so that Plaintiff can be made whole.

150.     We seek a declaratory judgment as stated.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Permanent Injunction Prohibiting Pursuing a Condominium Filing)

151.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

152.     Plaintiff Manny Roel has expressly opposed forming and filing with the Attorney General's Office an offering plan to form a formal condominium under the laws of the State of New York.  Rather, it was always his and Joe's intention that the Barclay Project under RLCH be sold as an entire property.

INDEX NO. 709652/2017
RECEIVED NYSCEF: 12/28/2018

153.     Accordingly, Plaintiff seeks a permanent injunction, barring and prohibiting RLCH, Inc. from filing and forming a condominium, rather, we seek an order allowing the building to be sold as a whole property.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Constructive Trust)

154.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

155.     As a matter of equity, RLCH, INC., and the Barclay Project should be placed in a constructive trust until this lawsuit is fully adjudicated to protect the Plaintiff from transfer of ownership or other methods of avoiding payment on the inevitable judgment in this case, including from encumbering the property without Plaintiff's consent.  As the successor entity to all of the other prior entitles, individuals and their projects, it is the only entity of value at this point.  And given the extreme fact patter, and the fact that Lam and Cheung in particular are working on trying to file a condominium offering plan with the Office of the Attorney General, something which Manny (and we believe Joe) are strictly opposed to, this property and its assets must be protected.

156.     Accordingly, we seek an order that RLCH, Inc. be held in a constructive trust pending the outcome of this case, along with all of its assets.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### (Accounting for all Projects and Matters/Access to All Books and Records)

157.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

158.     Based upon the aforesaid, Plaintiff is entitled to a full accounting in connection with all of the underlying projects set forth herein, as well as full and unfettered access to all books and records for all of the projects, both in corporate and individuals names.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### (Declaratory Judgment voiding ab initio a so-called "Lottery Agreement)

159.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

160.    Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon an actual and justiciable controversy in this matter.

161.    The Barclay Project which is owned by RLCH is comprised of approximately 25 units which the parties would like to convert into a legal condominium by filing an offering plan with all associated paperwork with the Office of the Attorney General in and for the State of New York and gain their approval.

162.    To date, however, no offering plan has been filed as there remains a few issues which are impediments to same, my attorney so advises.  And while we anticipate resolving those issues in order to file an offering plan application, we are not there yet.  But it is certainly the desire and intention of all of the parties that the Barclay Project result in a residential condominium property, that being the highest and best use of the property and the type of outcome which would maximize shareholder value for the corporation.  The resolution of the impediments to filing this offering plan are in process and we hope to have those issues resolved as quickly as possible.

163.    Therefore, to be clear for the purposes of this cause of action, as of the date hereof, there are no individual units at the Barclay Project which are condominiums, and thus no individual units which can be sold, transferred, encumbered or conveyed in any way as fee simple absolute properties, as none exist.

164.    On or about September 18, 2014, a so-called "Lottery Agreement" was created by the parties without counsel or legal advice apparently, which document purported to transfer each of the units on each of the six (6) floors (considered floors 2-7) to the shareholders.  However, as

there are no units and no floors which may be individually sold, transferred, encumbered or distributed by RLCH (either on September 18, 2014 or as of today) -- as the units are not lawful condominiums or cooperatives -- this Lottery Agreement was void *ab initio* as RLCH and the individuals who created same had no legal right to attempt to do so.

165. Stated another way, while Plaintiff acknowledges through counsel that there is no private right of action under the Martin Act (See <u>Kerusa Co, LLC v. W10Z Real Estate</u>, 12 NY3d 236 (2009)), there is still a right to allege claims which relate to a violation of the Martin Act, such as in this instance, where a company (RLCH) and some of its shareholders tried to contract to transfer units despite the fact that those units were not saleable units, were not condominiums or cooperatives, and were otherwise not fee simple owned units which could be alienable in a sale, transfer or by any other means. So as RLCH had no saleable or transferrable units at the time of this Lottery Agreement, said document must be deemed unenforceable as the subject matter of the agreement, the thing to be transferred did not actually exist.

166. Plaintiff's counsel, Robert Werth, has advised Plaintiff that both Tom Berinato, Esq., the company's condominium counsel, and Janice Goldberg, Esq. of Herrick Feinstein, the company's general counsel, have advised that they both consider this Lottery Agreement to be a null and void *ab initio* for the reasons stated.

167. Accordingly, as there is an actual and judiciable controversy regarding the validity of this so-called Lottery Agreement, Plaintiff asks this court to issue a declaratory judgment finding that the Lottery Agreement is void *ab initio* and has no legal force or effect.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
### (Derivative Claim on Behalf of RLCH, For the Ejectment of
### MOU YANG LAM and all INDIVIDUAL DEFENDANTS)

168. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

169. This cause of action is brought, including but not limited to, pursuant to Business Corporation Law Section 626, which is the right of any shareholder to bring a derivative suit in the right of a corporation.

170. In this instance, pursuant to applicable law regarding the commencement a derivative claim, we do hereby plead proper notice being granted to RLCH, to its counsel, Herrick Feinstein, advising of the existence of the following conditions. Notice to Janice Goldberg, Esq., counsel working on this matter for Herrick, was provided by Plaintiff's counsel in several emails and in several calls from July through September of 2018. Despite the clear evidence of the issue, Ms. Goldberg advised Mr. Werth that RLCH President Lisa Lam, who also happens to be the daughter of Mou Yang Lam, advised Ms. Goldberg that the facts stated below simply do not exist and that her father is not responsible for the conditions at issue. Accordingly, having given RLCH, through its counsel, the opportunity to file this claim on behalf of the company, they have specifically advised Mr. Werth that they will not do so, resulting in the filing of this derivative claim.

171. As a shareholder of RLCH, Plaintiff has the legal right and the proper standing o file this derivative claim since RLCH has abrogated its responsibility to do so.

172. It is a fact that RLCH is not a landlord as defined under New York law, as the Barclay Project is neither a lawful condominium permitted to rent out legally compliant residential units, nor is it a building registered with the Division of Housing and Community Renewal, so is not permitted to rent out units to any individual as a residence under that legal authority. Simply put, at this time, RLCH may not rent out units or allow any individuals to use or occupy any of the units until it clears various legal hurdles.

173.     As RLCH is not and cannot be deemed a landlord, the individuals against whom ejectment is sought – which are Mou Yang Lam and all other Individual Defendants – are not and cannot be considered tenants.  This is why ejectment is the proper cause of action.

174.     In point of fact, it is a legal hurdle and one of the current impediments to our filing of a condominium application that it appears at least one of the shareholders of RLCH, namely, defendant Mou Yang Lam, has taken up use and occupancy and/or is certainly exercising dominium and control of the single largest unit in the building which Plaintiff believes to be denoted as Unit 7A, a 3-bedroom unit, and that he and his family have been making renovations, installing upgraded appliances, and generally making changes to the apartment in his plan to have said unit and the rest of the 7th floor be legally owned by him.

175.     Upon information and belief, Mou Yang Lam has taken over and/or exercised dominium and control of Unit 7A and the balance of the 7th floor as he still believes that the Lottery Agreement is an enforceable document and upon review of that document it does in fact indicate that the 7th floor would belong to him, so that document would be consistent with his actions, albeit against the law as again, the Lottery Agreement is void *ab initio*.

176.     But notwithstanding same, and upon an inspection of the building by Plaintiff himself in the Summer of 2018, he discovered that Mou Yang Lam (or his agents, contractors, etc.) had replaced all of the kitchen appliances which are in all of the other 24 units in the building – essentially standard appliances which are used in basic level apartments industry wide – with very high-end appliances.  For example, the regular stove was replaced with a high end extra-wide stove/oven with extra-large burners and with a special center cut out specifically designed for a wok.  No other units in the building have this appliance.  Likewise, the standard refrigerator used in all of the other 24 units in the building was replaced by Mr. Lam with a very high-end double wide appliance with a double capacity as the standard building refrigerators.  In addition, the

Case 1:20-01102-fcg Doc 1-1 Filed 08/28/20 Entered 08/28/20 17:03:31

kitchen sink has double bowls with a much greater length and depth, again as opposed to the standard single bowl kitchen sinks in all other units. Continuing, this unit has its standard mini washer-dryers replaced with a full capacity front load washer and dryer.

177. Continuing further, it is noted that the main room has been upgraded and there appears to be wiring coming from at least six locations, clearly being custom-designed by Mr. Lam for his plans to take over this unit, for reasons which could include to light art work or for other reasons unknown. But is certainly beyond dispute that Mr. Lam has taken over this unit and making custom renovations, also noted by the different color of the plaster surrounding this new wiring, as compared to the plaster which is in the rest of that apartment and all other apartments, which evidences that these new custom renovations was done in the past few months. Still further, this unit 7A has separate hearing and air conditioning units which are separate and distinct from the central HVAC system which the other 24 units jointly use.

178. Finally, some furniture was noted in this unit by Plaintiff and various foods containers and wrappers, evidencing that workers had been there at the time Plaintiff did his walk through.

179. Upon information and belief, other units and floors at the property are being used and/or occupied and/or having dominium or control over them exercised by the other Individual Defendants, warranting their ejectment from the property along with Mr. Mou Yang Lam.

180. As Title 20 of Part 13 of the Attorney General Rules and Regulations for the filing of an application for a Newly-Renovated and Vacant property for conversion to a lawful condominium, is the provision that RLCH's condominium attorney is filing under, we will have a permanent impediment to our filing of an offering plan unless Mou Yang Lam and any of the other Individual Defendants do not clearly relinquish all claims to right, title and interest in all units and floors. Plaintiff's counsel has been advising this to counsel for RLCH and to the attorneys

representing the Individual Defendants, including Mr. Lam, for almost a year now. But it is only since Herrick Feinstein came on board as substitute counsel for RLCH that this point has become clearer and in fact Janice Goldberg, Esq. of Herrick has advised that this claim should be able to be resolved by all parties signing appropriate affidavits and then clearing out all property, appliances and other indicia of dominion and control (aka ownership). But until such time as this remains an issue, RLCH will never be able to get an approval from the Attorney General's Office to allow the company to move forward with sales and seek to have the offering plan declared effective.

181.    Accordingly, Plaintiff, as a shareholder of RLCH, and acting in a derivative capacity under this cause of action on behalf of RLCH, seeks judgment granting ejectment of all parties in this action, in order to no longer be an impediment for condo conversion.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### (Declaratory Judgment Voiding All Sales or Transfers of RLCH by Esther Hsu

182.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

183.    Plaintiff seeks a declaratory judgment, pursuant to CPLR §3001, based upon an actual and justiciable controversy in this matter.

184.    In the Spring of 2018, it was brought to the attention of Robert D. Werth, Esq., counsel for Plaintiff that Defendant Esther Hsu ("Esther") had entered into several contracts to sell portions of her purported interest in RLCH. We denote her interests in RLCH as "purported" since no one has ever seen a single piece of paper which provides for the legal transfer of the interests of Joe Hsu, who Plaintiff knows to be a shareholder of RLCH, to Esther Hsu.

185.    Nevertheless, Plaintiff was made aware that Esther entered into a series of transactions which purport to sell her interests in RLCH and specifically state that the sales include

apartments 5D and 5A, to individuals including but not limited to, Sin Yung Cheng. Guilin Zhang Tao Chen, Sai Mei Huang, and potential others, for sums in excess of One Million Dollars.

186.     As set forth above, on the same ground in which the Lottery Agreement must be deemed null and void, Esther Hsu had and has no legal right, title or interest in any of the units in the building or to any of the floors which contains units in the building.  RLCH was and remains the only owner of the Barclay Project so would be the only party, in theory, who could sell, transfer or encumber same; although we note for the record that side agreements among the shareholders would prohibit same at this time.

187.     While we are in the process of subpoenaing and gaining documents to further understand exactly what Esther Hsu has done with regard to her purported interests in RLCH, and despite the fact that Esther Hsu and her attorney, Jack Glasser, have vehemently opposed providing any documents or any information about her transactions, the Court (Justice Leonard Livote) has granted motions filed by Plaintiff's counsel to obtain this information.

188.     Critically, if Esther has bound RLCH in some manner or otherwise has sold units at the Barclay Project, this is yet another impediment to our ability to gain approval of an offering plan from the Attorney General's Office, rending these outrageous actions on the part of Esther Hsu to be a gross breach of her fiduciary duties to the company, as she was at the time of these transactions, an officer and a director of the Company, so this is a gross abuse of her position in the company and purely self-dealing.  Moreover, neither she nor Joe Hsu disclosed any of these transactions to any of the shareholders.

189.     Thus, for pleading purposes, while we know little more than the fact that Esther Hsu did in fact enter into a series of documented transactions to sell units at the Barclay Property, which is prohibited by law as there is nothing to sell at this point, with the exception of the entire

47

building; no individual units can be sold by anyone, including RLCH, court intervention is necessary as a matter of equity.

190.    For these reasons, Plaintiff seeks a declaratory judgment declaring all sales and potential sales to be deemed null and void ab initio, and any recorded deeds to any units which resulted from these transactions must be set aside upon order of the court directing the Clerk of the Court to remove same from the record.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### (BCL 624(a) Claim against RLCH & Joe and Esther Hsu to Inspect all Books and Records)

191.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

192.    For years, Plaintiff has demanded and asked Joe and Esther Hsu to grant access to inspect the books and records of all of the corporation entities, including RLCH.  In every instance, Joe Hsu would come up with some excuse or reason not to let him or his accountant or attorney access.  This is part of his plan to keep Plaintiff and the other individual defendants in the dark, some of whom were investors in most of the tent (10) transactions at issue, and we believe to conceal the serious wrongdoing and financial crimes perpetrated by Joe and Esther Hsu against all of the other parties in this case.

193.    The most recent formal demand specifically with regard to RLCH was made by letter from Plaintiffs formal counsel, Lipsitz Green Scime Cambria dated April 8, 2016, which contains a very detailed list of the documents being sought, including the organizing documents, banking records, tax returns, general ledger of RLCH, minutes of all board meetings, executive committee meetings and shareholders meetings, any sales agreements made by anyone from RLCH[2], payroll records and other documents.

---

[2] This is a particularly interesting demand, which Joe and Esther Hsu REFUSED to respond to, as the date of this letter from Plaintiff's prior counsel is April 8, 2016, while Esther Hsu's first sales' transaction was dated February 11, 2016, so the Hsu's were clearly avoiding providing this information in particular given how improper it was.

194.     In response, neither Joe Hsu, Esther Hsu or their counsel, Jack Glasser, Esq. provided any documents to Plaintiff or any of the individual defendants, despite the express statutory obligation to do so under BCL 624.

195.     Accordingly, Plaintiff seeks a judgment or order compelling the immediate right to inspect all of the records which Joe and Estehr Hsu possess, even though they are no longer either an officer or director of RLCH, having been replaced by individuals voted on by the corporate shareholders in February of 2018.

## CONCLUSION

196.     In law and equity, Plaintiff prays for the relief requested.

 **WHEREFORE**, Plaintiff respectfully pray for judgment as follows:

**(i)**      on his First Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(ii)**     on his Second Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(iii)**    on his Third Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(iv)**    on his Fourth Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(v)**      on his Fifth Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(vi)**    on his Sixth Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

**(vii)**   on his Seventh Cause of Action, in an amount to be determined at trial, but believed to be in excess of $3,000,000 plus interest;

(viii)  on his Eighth Cause of Action for a Declaratory Judgment as set forth above;

(ix)  on his Ninth Cause of Action for a Declaratory Judgment as set forth above;

(x)  on his Tenth Cause of Action for a Declaratory Judgment as set forth above;

(xi)  on his Eleventh Cause of Action for a Declaratory Injunction as set forth above;

(xii)  on his Twelfth Cause of Action for a Permanent Injunction as set forth above;

(xiii)  on his Thirteenth Cause of Action for a Declaratory Injunction as set forth above;

(xiv)  on his Fourteenth Cause of Action for an Accounting on all Projects and Matters,
and Access to All Books and Records for all Projects;

(xv)  on his Fifteenth Cause of Action for a Declaratory Judgment as set forth above;

(xvi)  on his Sixteenth Cause of Action for Ejectment as set forth above;

(xvii)  on his Seventeenth Cause of Action for a Declaratory Judgment as set forth above;

(xviii)  on his Eighteenth Cause of Action for a Judgment compelling Joe and Esther Hsu

the right to inspect all of their books and records in regard to RLCH;

(xix)  and for such other and further relief as the Court deems just and proper.

Dated: December 28, 2018
New York, New York

By:

Robert D. Werth, Esq.
Attorney for Plaintiff
666 Greenwich Street, Suite 507
New York, New York 10014
(212) 685-5445

50

## VERIFICATION

**STATE OF NEW YORK** )
                 ) ss.:
**COUNTY OF NEW YORK** )

**MANUEL ROEL**, being duly sworn, deposes and states as follows:

    1.    I am the sole individual plaintiff herein, and either 50% shareholder or a minority shareholder for each of the following business entities: (i) Roel & Hsu Corp., (ii) CHRL Realty Corp., (iii) RLCH Inc., and (iv) 190-15 48th Avenue Corp. I have personal knowledge of the facts set forth herein.

    2.    I have read the foregoing First Amended Verified Complaint, and know the contents thereof to be true to my own personal knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true. The grounds of my belief as to all matters not stated upon my own knowledge are based upon our company files, my own business filed, conversations, correspondence, statements, records, and other writings and documents, as well as my own experience with the parties and the circumstances underlying this action.

                                  _Manuel Roel_
                                  **MANUEL ROEL**

Sworn to before me this
28th day of December, 2018.

_Notary Public_

ROBERT D. WERTH
Notary Public, State of New York
No. 02WE6101146
Qualified in New York County
Commission Expires December 19, 2015